Filed 5/26/16  In re D.P. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re D.P., et al., Persons Coming Under the Juvenile Court Law. | B267137 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK11293) |
| Plaintiff and Respondent, | |
| v. | |
| ANDREA F., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Stephen Marpet, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith David, Assistant County Counsel and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

Andrea F. (mother) appeals from orders sustaining a Welfare and Institutions Code section 300 petition as to her son D.P. and daughter A.P. (the children), removing them from her custody and limiting her to monitored visits. She contends the orders are not supported by sufficient evidence.[1] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Referral and Investigation*

Viewed in accordance with the usual rules on appeal from an order sustaining a section 300 petition (*In re E.B.* (2010) 184 Cal.App.4th 568, 578), the evidence established D.P. was born in June 2012; A.P. in May 2013. A general neglect referral brought the family to the attention of the Department of Children and Family Services (DCFS) in May 2015.

No one was present on Friday, May 8, when the social worker arrived at the family home to investigate the referral. A neighbor confirmed the general neglect allegations, which included that mother and father did not work; they sometimes did not come home until 11:00 p.m.; father was observed leaving the home at 2:00 or 3:00 a.m.; the children were not fed until the parents woke up at noon; on one occasion the children were not fed until 6:00 p.m.; when the children were fed, they were given cookies and potato chips; the children were observed to "always" have poor hygiene. The apartment manager confirmed that the parents came home late at night and left early in the morning; although they had a parking space, they always parked a block away; the apartment was cluttered and roach infested; the parents were five months behind in rent and an eviction was in progress; because they did not have a key to the home, they used a window for entry and exit.

When the social worker met mother and father at the family home later that day, they said they did not live there. The children had no marks or bruises but they were wearing dirty clothes and had poor hygiene. The social worker observed "trash, old food,

---

[1] All future undesignated statutory references are to the Welfare and Institutions Code and to the 2015 version of the applicable statute.

dirty diapers and roach infestation." There were roaches on the floor, in the bed and the refrigerator. During the social worker's visit, mother and father allowed the children to lie on the floor amid clothes and blankets that were "severely roach infested." Explaining the lack of unspoiled food in the refrigerator, the parents said they ate out or bought prepared foods. Explaining their inability to show the social worker any clean clothes for the children, the parents said they had not had time do laundry. Mother and father agreed to a safety plan which included moving with the children into paternal grandmother's home in Downey until the problems at the family home could be rectified. The social worker provided mother and father with a list of resources and arranged to meet with them again the following Tuesday, May 12.

When the social worker talked to paternal grandmother on the day of the referral, paternal grandmother said she, too, was concerned about the condition of the home, the children's poor hygiene and lack of nutrition, and that the children roamed through the house unsupervised while mother and father slept until mid-day. Paternal grandmother said she had tried to help practically and financially, but stopped several months ago because she feared she was "enabling" mother and father. Paternal grandmother had loaned mother and father money for food and diapers; she had recently loaned them rent money. Paternal grandmother was unaware of any substance abuse.

The social worker confirmed on a telephone call with father on May 11 that the social worker and parents would meet the next day at 8:30 a.m. When the social worker arrived at the appointed hour on May 12, no one was home. Unable to make contact with mother or father, the social worker called paternal grandmother. Paternal grandmother said mother and father were still asleep. Paternal grandmother stated that mother and father did not appear to be making any effort to care for the children or seek employment. The social worker arranged to go to paternal grandmother's home that day.

At paternal grandmother's home, the social worker observed mother and father lounging in recliners while the children roamed through the house, unsupervised. Paternal grandmother complained that mother and father were not cleaning up after the children and she was concerned that her house would also be roach infested if they

3

continued to live there. The social worker interviewed father, who appeared to be under the influence. Father said he had been using methamphetamines "for some time" but had not used in one or two months; he used marijuana to relax and to avoid methamphetamines. Father explained that he did not have a substance abuse problem because he could stop using drugs if he chose to do so. When the social worker told father he could not take the children to Mexico in light of his admitted drug use, father emphatically refused to stop using marijuana, then "slammed on the table and rushed out the back door. He stated that his plan was to leave to Guadalajara, Mexico and to allow the mother to care for the children." Mother rushed after father and begged him not to leave. Mother and father eventually returned to the house.

Mother told the social worker she loved father and wanted to go with him to Guadalajara. She said father became angry and threatened to leave mother and the children whenever mother urged him to stop using drugs. Recently, father had taken to staying in the bathroom all day, only coming out so that someone else could use it. Mother denied she was a substance abuser, but admitted smoking marijuana with father. Mother did not "express any concern" about the condition of the family home or that the children were being cared for by someone using illicit drugs.

The social worker concluded that mother and father "minimized the condition of the home and their inability/unwillingness to meet the children's basic needs." Based on father's stated intention to take the children to Mexico that day, the social worker concluded that mother and father were flight risks. Mother and father allowed the social worker to detain the children without a warrant and agreed to drug test. Later that day, mother was a "no show" for the drug test, and father tested positive for methamphetamines, amphetamines and cannabinoids.

*B.*     *Detention*

The section 300 petition DCFS filed on Friday, May 15, alleged dependency jurisdiction based on the unsanitary conditions at the family home (paragraph b-1); mother's history of "substance abuse" and current marijuana use (paragraph b-2); and

4

father's history of "illicit drug use" and current use of methamphetamines and marijuana (paragraph b-3).

Following a detention hearing, the juvenile court found DCFS had made a prima facie showing that the children were persons described by section 300, subdivision (b) and there was no reasonable means to protect them other than removal. It gave DCFS discretion to release the children to mother or any appropriate relative. Meanwhile, it ordered monitored visits for mother and father, with DCFS discretion to liberalize. Mother and father were ordered to random drug test weekly and to participate in parenting and individual counseling; additionally, father was ordered to participate in a drug program. The court established dates for future hearings, including a pretrial conference on May 29, a jurisdiction hearing on July 2 and a disposition hearing on July 24. The record on appeal includes only a Reporter's Transcript for the disposition hearing.

The report for the May 29 pretrial conference stated that mother and father were no longer living with paternal grandmother. The social worker had been unable to make telephone contact with mother or father, but spoke with paternal grandmother. Paternal grandmother said she was willing to care for the children, and also to have mother and father live with her. But paternal grandmother lived in a one bedroom apartment with her teenage son and daughter. Following the hearing on May 29, the juvenile court gave DCFS discretion to place the children with any appropriate family member pending the jurisdiction hearing set for July 2.

Mother and father did not attend a multidisciplinary assessment team (MAT) meeting on June 23. According to the MAT report, the caretaker reported that the children hit the parents during visits and D.P. cried for a long time after visits. A.P. hit and kicked D.P. repeatedly during the week, although this behavior had decreased since the children had been with the caretaker.

The social worker interviewed mother and father on June 24, the day after the MAT hearing. Mother said the home in which they lived when the children were detained was roach infested when they moved in; she had cleaned with bleach and the

5

house had been fumigated, but the problem persisted.  On the day the social worker arrived to investigate the referral, the house was particularly dirty because the family had not lived there for the prior two weeks.  Mother denied a history of marijuana use.  She tried marijuana for the first time in April 2015.  Although she did not like it, she occasionally smoked marijuana with father.  When mother smoked marijuana, the children were asleep or being watched by neighbors.  Mother denied that father had a history of methamphetamine use.  Mother observed the signs of father's methamphetamine use on two occasions, when father did not sleep for two nights.

Father acknowledged the family home was dirty when the social worker first visited, but said it was because they were in the process of moving.  During the prior two weeks, the family had been staying with friends in San Bernardino while they looked for more affordable housing there.  Father said mother "barely" smoked marijuana; at most, four times in a two week period.  Father said he tried methamphetamines "out of curiosity" about three weeks before the social worker's first visit.  When he tried to stop smoking methamphetamine, father experienced anxiety, so he continued using.  Father began smoking marijuana so as not to feel the effects of not smoking methamphetamines.  The children were never present when mother and father smoked marijuana.  Father said he no longer used any drugs.  Instead, he drinks water and exercises to cope with his anxiety.

C.      *Jurisdiction and Disposition*

        1.      Jurisdiction

        The report for the July 2 jurisdiction hearing stated that the children were doing well in their placement and the caretaker was interested in adoption.  Mother and father were living together in Bell Gardens, and their monitored visits were consistent and went well.  They said a paternal great aunt was interested in caring for the children, but the aunt told the social worker that her home was unlikely to be approved.  Mother and father had not consistently drug tested.  They gave as excuses their failure to understand the drug-testing schedule, not having identification necessary to drug test, and the distance to the drug-testing site.  The social worker explained the process, gave them proper

6

identification, and arranged for a more convenient drug-test location. The jurisdiction hearing was continued to July 24, the date already set for disposition.

By the time of the July 24 hearing, mother and father were once again living with paternal grandmother. They were looking for an apartment in San Bernardino County, where mother intended to live with the children, while father lived with a friend nearby. Monitored visits were consistent and went well. Both parents enrolled in a 12-week parenting class in May, but both had missed classes; the program director characterized mother's attendance as "average" and father's as just "fair."

Neither mother nor father had consistently drug tested. During the 10 weeks between the children's detention on May 12 and the July 24 hearing, mother tested negative for all substances four times. But she was a "no show" on five occasions. Father tested positive for methamphetamines, amphetamines and cannabinoids on May 12. He tested positive for cannabinoids but negative for all other substances on June 19. He tested negative for all substances on July 7 and 17, but was a "no show" on two other occasions. Father told the social worker he had not enrolled in a drug treatment program because he could not afford the fees.

Mother and father appeared at the July 24 hearing, but neither testified. Through counsel, father challenged the sufficiency of the evidence to support dependency jurisdiction based on unsanitary living conditions at the family home inasmuch as they no longer lived there (paragraph b-1). Regarding dependency jurisdiction based on his substance abuse (paragraph b-3), father asked that the petition be amended to reflect the evidence that he no longer used drugs. Mother's counsel argued the evidence established nothing more than "some sporadic marijuana use. Even father indicated she was never a regular marijuana user and she's never provided a dirty test, not even for marijuana."

Children's counsel urged the juvenile court to sustain the petition, arguing: "I believe that mother does indicate, at least, a history of usage and I know that case law has indicated there needs to be a nexus between marijuana and the risk and I believe the risk is evident, given the state of the home and the neglect these children were – that they

7

were in this home, that was extremely dirty, very – I think conditions in the home were not very safe and appropriate for these children."

The juvenile court dismissed paragraph b-1 (unsanitary conditions) but sustained paragraphs b-2 (mother's substance abuse), and b-3 (father's substance abuse).

2.     Disposition

The children's counsel argued that it would not be safe to release the children to mother so long as she was living with father. Neither mother nor father made any separate arguments regarding disposition. Notably, neither suggested as an alternative to removal that father would immediately move out of paternal grandmother's home so that the children could be returned to mother. (See § 361, subd. (c)(1)(A) & (B).)

The juvenile court found by clear and convincing evidence that there would be a substantial danger to the "physical and mental well being" of the children if they were returned to parental custody, and there was no reasonable means to protect them without removal. (See § 361, subd. (c)(1).) Custody of the children was given to DCFS for suitable placement; DCFS was given discretion to release the children to mother, but ordered to "walk the matter on" before doing so.

Mother and father were ordered to participate in drug testing and counseling and father a drug treatment program.

Mother timely appealed from the July 24 orders.

**DISCUSSION**

A.     *Justiciablity*

DCFS contends mother's appeal should be dismissed for lack of justicability. It argues mother does not challenge the jurisdictional findings based on father's conduct, or the drug-testing element of the disposition order. Although mother challenges the removal order, DCFS agues this is not enough to establish justicability because the children could be removed even without a jurisdictional finding based on mother's conduct. We exercise our discretion to consider the appeal.

8

As a general rule, "an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence. [Citations.]" (*In re I.A.* (2011) 201 Cal.App.4th 1484.) However, an appellate court has discretion to consider the merits of jurisdictional findings against one parent where "the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763 (*Drake M.*)).

Section 361, subdivision (c)(1) identifies two "reasonable means to protect" which the juvenile court must consider as alternatives to removing a dependent child from parental custody. One is allowing a "nonoffending parent or guardian to *retain* physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1)(B), italics added.)

As a result of the jurisdictional finding against mother in this case, she was not a "nonoffending" custodial parent and the juvenile court could not consider the section 361, subdivision (c)(1)(B) alternative to removal. Thus, the jurisdictional finding itself as to mother had an adverse impact on mother in these dependency proceedings. For this reason, we exercise our discretion to consider the merits of mother's appeal.

*I.A.*, on which DCFS relies for a contrary result, is factually inapposite. The *I.A.* court explained section 361, subdivision (c)(1)(B) applies only to custodial parents; since I.A. had never lived with the appellant/father, the provision was inapplicable in that case. (*In re I.A., supra,* 201 Cal.App.4th at p. 1495.) The subdivision applies here because the children were living with mother at the time they were detained.

B.     *Sufficiency of the Evidence to Support the Jurisdiction Order*

Mother challenges the sufficiency of the evidence to support dependency jurisdiction based on her history of substance abuse and current use of marijuana. She argues her drug tests were consistently negative, there was no evidence that her parenting

"was affected by drug abuse or past, sporadic use of marijuana," and no evidence she would continue using marijuana.  We disagree.

1.      Substance abuse

Dependency jurisdiction may be based on a finding that the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the inability of the parent or guardian to provide regular care for the child due to the parent's . . . substance abuse."  (§ 300, subd. (b)(1).)  A substance abuse finding may be based on evidence the parent "has a current substance abuse problem as defined in the" Diagnostic and Statistical Manual of Mental Disorders (DSM).  (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217, citing *Drake M., supra,* 211 Cal.App.4th 754.)  One definition of "substance abuse" found in the DSM-IV-TR is: "recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., . . . neglect of children or household)" occurring over a 12-month period.  (*Christopher R.*, at p. 1217, quoting the DSM-IV-TR, p. 199.)

A missed drug test is "properly considered the equivalent of a positive test result." (*Christopher R., supra*, 225 Cal.App.4th at p. 1217.)  By extension, a series of missed tests are properly considered the equivalent of a series of positive drug tests, from which recurrent use can be inferred.  Here, mother's five missed drug tests – the most recent one just three weeks before the hearing – constitute substantial evidence of "recurrent substance use."  The juvenile court was not required to credit either mother's explanation for the missed tests or the parents' claim that mother smoked marijuana infrequently.

2.      Risk of harm

But a "parent's use of marijuana 'without more,' does not bring a minor within the jurisdiction of the dependency court.  [Citation.]"  (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.)  There must be evidence that the parent's marijuana use subjects the child to a specific, non-speculative and substantial risk of serious physical harm.  (*Ibid*.)  "A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citations.]"  (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.)  And when the child is very young, a substance

abuse finding is prima facie evidence of an inherent risk of physical harm arising from the inability to provide regular care. (*Drake M., supra*, 211 Cal.App.4th at p 767; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 826, superseded by statute on another ground.)

Here, there is no dispute that the conditions in which three-year-old D.P. and two-year-old A.P. were living while in parental custody placed them at substantial risk of physical harm. A reasonable trier of fact could conclude that mother's substance abuse was the reason she neglected the family home and the children. That the risk of harm had not abated by the time of the July 24 hearing can be inferred from the evidence that mother never had more than two consecutive negative drug tests, she was still living with father, and she did not seem to understand the severity of the problems that brought the family into the dependency system. The fact that the court dismissed the unsanitary condition count did not mean the underlying facts, observed by the social worker, were not true.

Mother's reliance on *In re Destiny S., supra,* 210 Cal.App.4th at page 1004, and *Drake M., supra*, 211 Cal.App.4th 754, for a contrary result is misplaced. In both of those cases, the appellate courts reversed jurisdictional orders because there was no evidence of neglect. (*Drake M.,* at pp. 768-769; *Destiny S.,* at p. 1004.) In contrast to *Destiny S.* and *Drake M.*, there was substantial evidence that D.P. and A.P. were neglected while in mother's custody.

C.    *Sufficiency of the Evidence to Support the Disposition Order*

The juvenile court found by clear and convincing evidence that substantial danger existed to the "physical health of [the children] . . . and there is no reasonable means to protect without removal" from the parents' custody. Mother contends there was not clear and convincing evidence the children faced "a substantial danger of extreme abuse or neglect if returned to" mother, inasmuch as she had multiple negative drug tests, was participating in parenting classes and was amenable to other reunification services. We disagree.

11

1. Standard of review

A dependent child "shall not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence" of specified circumstances. (§ 361, subd. (c).) The "clear and convincing" standard that governs the trial court does not govern the appellate court. (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115-1116.) On a challenge to the sufficiency of the evidence to support removal, the appellate court reviews the order " 'for substantial evidence in a light most favorable to the juvenile court findings. [Citations.]' [Citations.]" (*Ibid.*)

2. Substantial evidence supports the disposition order

The juvenile court may limit parental control over a child that has been adjudicated a dependent child, but only to the extent necessary to protect the child. (§ 361, subd. (a)(1).) "Removal ' "is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent." [Citation.]' [Citation.]" (*In re A.R., supra,* 235 Cal.App.4th at pp. 1115-1116.) It requires clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) In determining whether the child would be in danger, the juvenile court should consider all surrounding circumstances, including the nature of the conduct that brought the children into the dependency system, as well as the parent's "current understanding of and attitude toward the past conduct that endangered a child . . . ." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025-1026.)

Here, the circumstance that brought three-year-old D.P. and two-year-old A.P. into the dependency system was substance abuse by mother and father, which rendered them incapable of providing the children with regular care and supervision. There is no challenge to the jurisdictional and dispositional findings based on father's substance abuse. A reasonable trier of fact could conclude the children were at continued risk of physical harm if returned to mother on July 24 based on (1) evidence of prior neglect;

12

(2) that mother had not consistently tested negative for drugs, which suggested she was still using; and (3) that mother had not found housing for herself and the children separate from father.

*D.     No Abuse of Discretion in Ordering Monitored Visits*

Mother contends the monitored visit order "was not supported by any showing that the children would suffer a substantial danger to their well-being if visitation were not monitored." She argues the order "was unnecessarily restrictive and did not promote the well-being of the children." We find no error.

1.     Standard of review

We review visitation orders in dependency cases for abuse of discretion. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284 [exit order]; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [disposition order].)

2.     Forfeiture

"In dependency litigation, '[a] party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.]' [Citation.]" (*In re T.G.* (2013) 215 Cal.App.4th 1, 13.) Here, mother did not object to the monitored visits order at the disposition hearing. Accordingly, she has forfeited the issue for appeal.

We are not persuaded otherwise by mother's argument that she is challenging the sufficiency of the evidence to support the monitored visits order and sufficiency of evidence challenges are not forfeited by failure to object in the trial court. *In re Joshua G.* (2005) 129 Cal.App.4th 189, on which mother relies for her argument, is inapposite. The *Joshua G.* court held the parents' challenge to the sufficiency of the evidence to support factual findings that were statutory prerequisites to the termination of parental rights (adoptability, inapplicability of the beneficial relationship exception) was not forfeited by their failure to object to the order on those grounds in the trial court. (*Id.* at p. 200, fn. 12.) Mother argues that, under *Joshua G.*, she has not forfeited her challenge to the sufficiency of the evidence "that a substantial danger to the children's well-being would exist if visitation were not monitored." The flaw in mother's argument is that we

do not use a substantial evidence standard for visitation orders; the order is reviewed for abuse of discretion. It is only necessary that a rational trier of fact could conclude that monitored visits would advance the child's best interests. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 188.) Mother forfeited her point by not objecting in the juvenile court.

> 3. <u>Monitored visitation advanced the children's best interests</u>

Even if mother did not forfeit her challenge to the monitored visits order, we would reject the contention on its merits.

Preserving the family unit is a major goal of the dependency system. (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 628-629.) Consistent with that goal, the juvenile court is required to provide reunification services whenever a child is removed from parental custody. (§ 361.5; *In re Luke L.* (1996) 44 Cal.App.4th 670, 678.) Visitation is an essential component of a reunification plan. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.) As part of such services, section 362.1 directs that visitation "shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).) But any visitation order must "protect the well-being of a dependent child while both maintaining ties between the child and parent and providing the parent with an opportunity to demonstrate why his right to custody and care of the child should be reestablished. [Citation.]" (*Christopher H., supra,* 50 Cal.App.4th at p. 1009.)

Mother has not shown the juvenile court abused its discretion in ordering monitored visits in this case. The evidence that led to detention included the unhygienic condition in which the children were living while in parental custody, as well as the parents' failure to give them regular, healthy meals. In contrast, monitored visits seemed to go smoothly. At a visit a few days before the July 2 hearing, the social worker observed that the mother and caretaker "spoke to each other with ease. The children seemed calm and played with their mom. The children appeared happy in the presence of their mother." The caretaker told the social worker that "the visits have gone well and the parents are loving with their children." In contrast, there was no evidence that mother

14

acted in a parental role towards the children during the monitored visit – no evidence that she fed them or changed their dirty diapers.  Absent such evidence, a rational trier of fact could conclude that the children's best interests would be advanced by monitored visits until mother could show that she could care for the children unsupervised.

## DISPOSITION

The July 24, 2015 jurisdiction and disposition orders are affirmed.


RUBIN, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.